**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

JESSICA JIMENEZ, Parent,
on behalf of G.G., Student,

     Plaintiff,

v.                                 Case No. 1:25-cv-00965-WJ-JFR

NEW MEXICO SCHOOL FOR THE DEAF,
BOARD OF EDUCATION
OF SANTA FE PUBLIC SCHOOLS, and
NEW MEXICO PUBLIC EDUCATION DEPARTMENT,

     Defendants.

---

NEW MEXICO SCHOOL FOR THE DEAF,

     Respondent-Appellant,

v.                                 Case No. 1:25-cv-0966-WJ-GBW

JESSICA JIMENEZ, for G.G., Student,

     Petitioner-Appellee.

**MEMORANDUM OPINION AND ORDER GRANTING**
**NMSD'S MOTION FOR A STAY**

THIS MATTER is before the Court on the New Mexico School for the Deaf ("NMSD" or "the School")'s Motion to Stay ("Motion"), which seeks to stay implementation of a due process hearing officer (DPHO)'s decision pending merits review under the Individuals with Disabilities Education Act (IDEA or "the Act"). **25-cv-966, Docs. 4 and 5**. The DPHO's decision ("HOD") issued on September 4, 2025, following a seven-day due process hearing concerning student G.G.'s education. **Doc. 11-1**. The DPHO concluded that G.G. — who is deaf and has autism and intensive behavioral needs — had been denied a free appropriate public education (FAPE) under

the Act. As a remedy, the DPHO ordered NMSD to fund G.G.'s placement at a residential therapeutic school and directed NMSD to locate an appropriate facility accredited by a state or regional authority in the United States, while taking into account the family's residence in Santa Fe, New Mexico.

G.G.'s mother ("Parent") and the School each seek review of the HOD in federal court, 20 U.S.C. § 1415(i). **25-cv-965, Doc. 1; 25-cv-966, Doc. 1**. Although both plaintiffs challenge aspects of the HOD, neither accepts the remedy, each contending that it exceeds the scope of the DPHO's authority. **25-cv-965, Doc. 1, ¶ 76**; **Doc. 14**.[1] Parent also asserts claims against the New Mexico Public Education Department for discrimination under the Americans with Disabilities Act, the Rehabilitation Act, the New Mexico Civil Rights Act, and violation of the IDEA. The Court consolidated the two cases on February 17, 2026. **Doc. 25.**

Pending merits review and final judgment, the School moves to stay implementation of the remedy ordered by the DPHO. Parent filed a response in opposition to the stay, and the School filed a reply. **25-cv-966, Docs. 11, 14**. After consolidation, the Board of Education of Santa Fe Public Schools (SFPS) filed a brief in opposition on March 3, 2026. **25-cv-965, Doc. 27**.[2]

The Court concludes that the Motion is well-taken and GRANTS a stay of the Hearing Officer's Decision to the extent set forth below.[3]

---

[1] In fact, no party interested in the HOD concurs in the remedy imposed. *Id.*; **Doc. 27 at 5 n.3**.

[2] The Motion was filed on October 6, 2025, in case number 25-cv-966. The Board of Santa Fe Public Schools is not a party to that action and asserts that it was unaware of the Motion until February 17, 2026, when this Court ordered that case consolidated with case number 25-cv-965, to which it is a party, resulting in constructive service. SFPS filed its response promptly — 14 days after the Court's consolidation order. *See* D.N.M.LR-Civ 7.4(a) ("A response must be filed within fourteen (14) calendar days after service of the motion). Given consolidation, SFPS has an interest in the issues raised by the Motion. The Court exercises its discretion to consider SFPS's opposition in resolving the Motion.

[3] At a status conference on March 19, 2026, the undersigned indicated he was inclined to grant a stay enjoining the implementation of the HOD's remedy. This opinion sets forth the basis for the Court's decision.

**BACKGROUND**

## I.    Statutory Background

The IDEA ensures that children with disabilities receive a free appropriate public education, that is, an education "tailored to the unique needs" of the child and "reasonably calculated to enable a child to make progress in light of the child's circumstances."  20 U.S.C. § 1400(d); *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391, 399 (2017).  The IDEA assists states, localities, and educational service agencies in providing an appropriate education to all children with disabilities.  *Id.* § 1400(d)(1)(C).  In turn, a state's eligibility for assistance under the IDEA hinges on its provision of a FAPE to all eligible children aged 3 through 21.  *Id.* § 1412(a)(1)(A).

State educational agencies are charged with "ultimate responsibility for the education of children in the state."  *Chavez ex rel. M.C. v. N.M. Pub. Educ. Dep't*, 621 F.3d 1275, 1285 (10th Cir. 2010); *see* 20 U.S.C. § 1412.  To deliver on the state's obligation to provide a FAPE to all eligible students, local educational agencies must develop IEPs tailored to meet each child's unique needs.  20 U.S.C. § 1412(a)(4).  The IDEA's implementing regulations make clear that its requirements extend beyond local educational agencies to encompass other state agencies and schools involved in educating children with disabilities, including state schools for children with deafness.  *See* 34 C.F.R. § 300.2.

Students with disabilities are to be "educated with children who are not disabled" as maximally appropriate.  20 U.S.C. § 1412(a)(5)(A).  The IDEA also directs that students with disabilities be placed in "special classes, separate schooling" or removed from "the regular educational environment . . . only when the nature or severity of the disability . . . is such that education in regular classes with the use of supplementary aids and services cannot be achieved

satisfactorily." *Id.*  This principle is termed a child's "least restrictive environment." *Id.* § 1412(a)(5).

Congress enacted the IDEA upon a finding that there is a national interest in the federal government's supporting efforts at the state and local level to educate children with disabilities. *Id.* § 1400(c)(5)(B).  The enacting Congress also found that special education could be improved by "strengthening the role and responsibility of parents and ensuring that families of . . . children [with disabilities] have meaningful opportunities to participate in the education of their children at school and at home." *Id.*  The IDEA, therefore, aims to facilitate parental involvement in their children's education.  To that end, the statute guarantees parents the right to participate in IEP meetings, obtain an independent evaluation of their child, and receive notice before an amendment to an IEP is either proposed or rejected.  20 U.S.C. § 1414 (b)(i); § 1415(b)(1), (3); *see also* 35 C.F.R. § 300.327.

When disputes arise regarding whether a child has been provided a FAPE, a parent may initiate a due process hearing before an impartial hearing officer within the state or local educational agency.  *Id.* § 1415(f).  Following that hearing, the officer determines whether the child was denied a FAPE.  *Id.* § 1415(f)(3)(e).  "Any party aggrieved by the findings and decision" made by the hearing officer may appeal the decision to federal district court.  *Id.* § 1415(i)(2)(A).  The district court may "grant such relief as [it] determines is appropriate," § 1415(i)(2)(C)(iii), including ordering changes in placement or requiring the provision — and funding — of specific educational services.  *Sch. Comm. of Burlington, Mass. v. Dep't of Educ.*, 471 U.S. 359, 369 (1985); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246–47 (2009); *Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Schs.*, 565 F.3d 1232, 1249 n.11 (10th Cir. 2009) (citing *Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 522 (D.C. Cir. 2005)).  In some cases, the relief ordered may include

prospective placement in a private facility if necessary to provide a FAPE in the student's least restrictive environment. *See Branham v. Dist. of Columbia*, 427 F.3d 7, 11–12 (D.C. Cir. 2005). Such remedies can carry significant financial implications for the responsible educational agency. *See Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993).

Though the statute does not define the authority of a hearing officer, courts have long read the statute to reflect a broad, equitable remedial scheme overall, including at the administrative level. Due process hearings are quasi-judicial proceedings and hearing officers are "vested with implied powers beyond those that are specifically enumerated." *Silva v. Dist. of Columbia*, 57 F. Supp. 3d 62, 67 (D.D.C. 2014). Upon a finding of an IDEA violation, due process hearing officers have the authority to fashion appropriate relief, "as long as [it is] supported by reasoning, comport[s] with due process, and achieve[s] the goal of providing a free, appropriate public education." *Id.*

Although a hearing officer's remedial authority is flexible, it is not boundless. The remedy must reflect these considerations. In reviewing a prospective placement, courts ask whether the remedy is appropriate to cure a denial of FAPE, whether it is supported by the record, whether it is necessary, and whether it respects least restrictive environment principles. *See Branham*, 427 F.3d at 12.

### II. Factual Background[4]

For present purposes, the Court summarizes the relevant facts as they appear on the existing record, which consists of the parties' pleadings and the DPHO's decision.[5]

---

[4] The present record before the Court does not include the administrative record below. On November 10, 2025, Magistrate Judge Robenhaar delayed setting a briefing schedule and stayed proceedings in light of NMPED's pending Motion to Dismiss. **Doc. 19**. At a status conference before the Court on March 19, 2026, the parties indicated that they would confer and jointly propose a briefing schedule and advise the Court when it should expect to receive the administrative record.

[5] The School disputes several of the DPHO's factual findings, as discussed in this section. For present purposes, the Court summarizes the findings as stated by the DPHO and defers any merits determination pending a more complete

G.G., who is deaf and has autism, attends Santa Fe Public Schools and is in the seventh grade. Until 2023, G.G. attended school in Carlsbad. When G.G. lived in Carlsbad, NMSD provided him with certain "outreach" services, including, at times, a "deaf mentor" in his home.[6] **HOD ¶¶ 10, 18**. At the suggestion of an NMSD consultant working with the Carlsbad public schools, G.G.'s educational placement was changed from Carlsbad Schools to NMSD. *Id.* ¶ 26. In Spring 2023, G.G., along with his mother and younger sibling, moved into a residence on NMSD's Santa Fe campus so that G.G. could attend the School's fifth grade program for a trial period to assess whether he would be a "good fit." *See id.* ¶¶ 29, 30, 40, 177.

The trial was successful, and it was determined G.G. should remain at NMSD. ¶¶ 50, 51, 60, 62. Through his classwork at NMSD, G.G. gained "foundational academic skills" and improved his ability to communicate with peers and instructors. *Id.* ¶ 51. An April 2023 addendum to G.G.'s individualized education plan (IEP) indicated that G.G.'s least restrictive environment was NMSD. *Id.* ¶ 43. The addendum also provided that G.G. would receive certain behavioral services, including up to 10 hours weekly of "direct behavior service from an outside agency's RBT [Registered Behavior Technician]." *Id.* ¶ 59.

G.G. enrolled permanently at NMSD on April 17, 2023, and entered, again, the fifth grade that fall. *Id.* ¶¶ 60, 63. G.G. was assigned a math teacher, MM, and another teacher and behavioral specialist, AC. *Id.* ¶¶ 44–45. MM and AC have degrees in deaf education, are fluent in ASL, and have training and experience working with students with autism. *Id.* ¶¶ 45, 46.

While attending NMSD, G.G. exhibited significant behavioral challenges, including hitting others and injuring himself. *Id.* ¶¶ 49, 57, 61, 107–12. When G.G. became agitated, he would

---

record.

[6] NMSD provides "outreach" services to deaf children and their families throughout New Mexico. Because the record is not fully developed at this stage, precisely what these services entail is not known to the Court.

throw classroom items, overturn chairs, and try to "physically assault" his teacher; for safety purposes, students needed to be evacuated from the classroom. *Id.* ¶ **108**. It was later observed that G.G.'s aggressive behavior stemmed from his "sensory needs." *Id.* ¶ **151**. In one incident, G.G. hit AC and pulled out her hair in the cafeteria; all students had to be evacuated. *Id.* ¶¶ **49**. When staff required assistance with G.G.'s behavior, AC would provide advice and model strategies. *Id.* ¶ **54**.

G.G. again enrolled at NMSD for the 2023–2024 school year and was placed in the alternative curriculum program. *Id.* ¶¶ **63, 65**. On March 21, 2024, NMSD completed an addendum to G.G.'s IEP. *Id.* ¶ **80**. Around this time, NMSD conducted a speech evaluation of G.G., which recommended that G.G. would "benefit from instruction in an ASL rich academic setting that provides him with opportunities to interact with adult deaf mentors and deaf peers." *Id.* ¶ **81**. At the conclusion of the 2023–2024 school year, the DPHO determined G.G.'s "appropriate educational plan" comprised the combination of an "immersive deaf environment in a deaf school" and "highly structured setting with behavioral specialists." *Id.* ¶ **85**.

G.G. returned to NMSD for the sixth grade in Fall 2024. Around this time, NMSD removed behavior analytic services and RBT from G.G.'s IEP. *Id.* ¶ **86.** Therefore, G.G. no longer had access to an RBT in the classroom or a behavior specialist to assist staff and Student's teacher with managing Student's behavior. *Id.* ¶ **89**. Unlike his fifth-grade teachers, G.G.'s sixth-grade teacher, RG, did not have a degree in deaf education. RG struggled to teach G.G. *Id.* ¶¶ **87–88**. The DPHO found that as a sixth grader, G.G. was not in "an ASL immersive deaf environment in [a] deaf school, with deaf mentors and peers, in a highly structured setting with behavior specialists focusing on his deafness and autism," G.G.'s least restrictive environment as determined by the DPHO. *Id.* ¶ **115**.

On October 3, 2024, NMSD held G.G.'s annual IEP meeting. Parent and a representative of SFPS participated. *Id.* ¶ 91. By this time, Student was suspended from NMSD at least nine days. *Id.* ¶ 107. NMSD proposed dropping Student from its rolls and placing him in Santa Fe Public Schools. *Id.* ¶ 97. At the meeting, it was determined that autism was G.G.'s primary disability. Parent disagreed with NMSD's proposal to transfer G.G. to SFPS and with the decision that autism was G.G.'s primary disability. *Id.* ¶¶ 97–98.

On November 18, 2024, G.G. enrolled at the Gonzales school within SFPS. *Id.* ¶ 121. Though SFPS's Deaf and Hard of Hearing Liaison resided at the school, none of the school's 320 students were deaf. *Id.* ¶¶ 123, 141. G.G.'s peers were unable to talk to him in a way he understood, and G.G. communicated with others primarily by pointing. *Id.* ¶¶ 131, 142. NMSD provided outreach services while G.G. attended SFPS, including visiting with SFPS's Speech Language Pathologist, who lacked experience working with students who are deaf and have autism. *Id.* ¶¶ 127, 133. G.G.'s fifth grade teacher at NMSD met with SFPS classroom staff to share classroom supports, material, and behavioral strategies. *Id.* ¶ 132.

A new IEP was drafted for G.G. on December 11, 2024. This IEP did not contain an immersive ASL deaf educational setting with deaf peers and adult mentors, with direct instruction in ASL. *Id.* ¶ 140. G.G.'s behavioral challenges intensified around this time. On one occasion, he broke the window to a classroom door and attempted to punch and slap SFPS staff. On another occasion, G.G. physically attacked his mother at school. *Id.* ¶¶ 167–68.

After just two months, G.G. was transferred from Gonzales School to Salazar Elementary. *Id.* ¶ 176. At Salazar, G.G. was placed in a classroom with children who were significantly younger. *Id.* ¶ 177. G.G.'s teacher lacked prior experience teaching deaf students and did not know ASL. *Id.* ¶ 179. No other Salazar teacher or staff member who worked with G.G. was

proficient in ASL. *Id.* ¶ 180. G.G. struggled to remain awake in class and was observed to be asleep about half the time. *Id.* ¶ 188. On some days, Parent helped settle G.G. into the classroom after the school day started; on many others, G.G. refused to enter the school. *Id.* ¶ 190. G.G. was also frequently asked to leave early and was suspended for at least four days. *Id.* ¶ 194.

A.    **The Due Process Proceedings**

Parent requested a due process hearing before the New Mexico Public Education Department on March 17, 2025. A seven-day hearing concluded on May 28, 2025, and the Due Process Hearing Officer issued a decision on September 4, 2025. *See* **HOD at 5–10**. The DPHO identified G.G.'s repeat fifth-grade year as a turning point. The DPHO found G.G.'s education was appropriate through the end of that year, *see id.* **at 54**, a finding Parent does not challenge. In addition, the DPHO determined that by the end of that year, G.G.'s appropriate educational plan became "an ASL, immersive deaf environment in a deaf school, and highly structured setting with behavior specialists." *Id.* ¶ 85 & 61.

According to the DPHO, these features — developed in the environment NMSD created for G.G. — were "no longer only 'methods' a school might choose to employ," but had become essential components of G.G.'s appropriate educational program. *Id.* ¶ 85. In the DPHO's terms, they became the "unique characteristics" of that program. *Id.*

Beginning in the sixth grade, however, the DPHO found that G.G. was no longer placed "in an ASL immersive deaf environment in [a] deaf school, with deaf mentors and peers, in a highly structured setting with behavior specialists focusing on his deafness and autism." *Id.* ¶ 115.

As a remedy, the DPHO ordered that G.G.'s educational placement is

> to be at a therapeutic setting in a highly structured immersive setting with other deaf students and teachers communicating with [G.G.] and with one another using ASL, combining the educational needs for deafness, severe autism, and [G.G.]'s challenging violent behaviors, for as long as it is appropriate and within the legal

9

framework of the IDEA. (*Id.* at 77).

The DPHO directed NMSD to identify an appropriate placement within 45 days and to bear sole responsibility for providing G.G.'s education. *Id.* at 77–80. The DPHO stated that the School should consider the family's Santa Fe residence but indicated that the placement could be located anywhere in the United States. *Id.* at 77–78. The DPHO also directed the School to provide in-home educational services for 45 days beginning on the date of the decision. *Id.* at 79. The DPHO further concluded that the School "has the continuing duty to provide an appropriate placement for" G.G. *Id.* at 77.[7]

NMSD disputes several of the DPHO decision's factual findings and conclusions, issues to be resolved at the merits stage. *See* **Doc. 1, 25-cv-966, at 6–9, ¶¶ 20–21**. For present purposes, the School challenges the remedy ordered by the DPHO and seeks to stay its implementation pending resolution of this action.

## ANALYSIS

NMSD seeks to enjoin implementation of the prospective placement and other ancillary relief granted by the DPHO. In evaluating a request to enjoin a DPHO's order under the IDEA, the Court applies the familiar preliminary injunction factors set forth in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).[8] *See Meza v. Bd. of Educ. of Portales Mun. Schs.*, No. 10-cv-963-JB-WPL, 2011 WL 1128876, at *11 (D.N.M. Feb. 25, 2011) (conducting a traditional preliminary injunction balancing test in the context of a similar challenge by a school

---

[7] The DPHO also directed that certain NMSD staff members participate in training in New Mexico's "eleven considerations of Autism, and behavioral supports" and drafting IEPs. *Id.* at 78. At the March 19, 2026, status conference, counsel for the School represented that that training has since been provided. The Motion's request to enjoin the implementation of this aspect of the DPHO's decision is therefore moot.

[8] The Court notes that the IDEA itself contains a "stay-put provision," that operates to maintain a child's educational setting pending resolution of administrative proceedings, 20 U.S.C. § 1415(j). *See Erickson v. Albuquerque Pub. Schs.*, 199 F.3d 1116, 1121 (10th Cir. 1999). Despite its potential relevance, no party argues its application here. That said, SFPS has, at present, undertaken to continue to provide G.G. an appropriate education, to the extent reasonably possible, within the parameters described by the DPHO. Therefore, in some respects, G.G.'s school setting will remain the same as it was at the initiation of administrative proceedings.

to a DPHO's order).  As the party seeking a stay or preliminary injunction, the School must

demonstrate that (1) it would suffer irreparable harm in the absence of an injunction; (2) it is

likely to succeed on the merits; (3) the balance of the equities tips in its favor; and (4) a stay is in

the public interest.  *Winter*, 555 U.S. at 20.

### I.    NMSD Has Shown Irreparable Harm in the Absence of an Injunction

In support of a stay, NMSD argues that the remedy ordered by the DPHO threatens

irreparable financial harm if implemented.  In its estimation, tuition for G.G.'s out-of-state

residential, therapeutic school would cost between $200,000 and $500,000 annually, **Doc. 5 at 3**,

and its obligations would continue indefinitely.  NMSD further asserts that the damage that

would be incurred if it is required to fully fund the ordered placement is compounded by the fact

that it does not receive any reimbursement for G.G.'s education from the NMPED or from the

federal government.  In turn, NMSD's stakeholders, including deaf students and families

throughout New Mexico, will be deprived of NMSD's services absent an injunction.

The Court agrees that the burden on NMSD is significant.  If required to implement the

decision immediately, NMSD would incur substantial nonrecoverable expenditures of up to

approximately one-fifth of its annual budget as of 2024.  *See* **HOD ¶ 25**.  The record reflects that

in addition to operating its Santa Fe campus, NMSD provides deaf education services to students

and families statewide.  **Doc. 5 at 3; HOD ¶¶ 18, 19.**  Diverting such a large share of its limited

resources to fund a single-out-of-state placement would necessarily impair its ability to provide

those services.  Once expended, these funds cannot be recaptured and the resulting programmatic

disruptions cannot easily be undone.

This risk is heightened where the obligation may continue on an indefinite basis pending

resolution of the merits.  The absence of clearly defined limits on the duration or scope of the

ordered placement further compounds that harm, introducing uncertainty that impedes budgeting and exposes the school to potentially escalating costs.

SFPS contends a stay is not necessary, given its agreement to maintain G.G.'s current placement. *See* **Doc. 27 at 3**.[9] While the record presents no reason to distrust that arrangement, it is informal and contingent, and it does not alter the legal effect of the DPHO's order, which requires NMSD to fund the ordered placement. Absent a stay, NMSD remains subject to that obligation and may be required to act on short notice. The existence of this informal arrangement does not eliminate the need for a court order, without which the HOD remains in place.

Without further legal and factual development, implementation of the HOD's remedy threatens immediate, irreparable harm without sufficient justification. The Court concludes that this factor weighs in favor of NMSD.

## II.     NMSD Has Shown a Likelihood of Success on the Merits

The IDEA considers that an education that is appropriate for one child with a disability involves nuance, imposing on states the obligation to craft an educational plan appropriate for each student's needs and then review and revise that plan. *See* 20 U.S.C. § 1412(a)(4); § 1414(d)(1)(A); *see also* 34 C.F.R. § 300.324. In the terms of the Supreme Court, the IEP is the "*modus operandi* of the Act,*" consisting of "a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs." *Burlington*, 471 U.S. at 368. In this same vein, once it is determined that a child has been denied a FAPE, the statutory framework contemplates a flexible remedy that is both equitable and compensatory. *See Florence Cnty. Sch. Dist. Four*, 510 U.S. at 15–16. Courts are vested with

---

[9] As stated on the record at the March 19, 2026, status conference, SFPS agrees continue providing G.G. a FAPE to its best ability.

broad discretion in construing the appropriate remedy, which seeks to (i) compensate for the harm resulting from the denial of a FAPE and (ii) ensure that appropriate services are employed to meet the child's unique needs going forward. *Burlington*, 471 U.S. at 369; *Sanders v. Santa Fe Pub. Schs.*, 383 F. Supp. 2d 1305, 1315 (D.N.M. 2004). In "fashioning discretionary equitable relief under IDEA" the court, and, by extension, the due process hearing officer, must "consider all relevant factors." *Florence Cnty. Sch. Dist. Four*, 510 U.S. at 16.

While the Act does not define "appropriate," the Supreme Court has defined a FAPE to "consist[] of educational instruction specially designed to meet the unique needs of the [disabled] child, supported by such services as are necessary to permit the child to benefit from the instruction." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 188–89 (1982) (quotation marks omitted). The statute does not speak to any level of substantive education that must be provided nor does it guarantee any particular outcome. Indeed, it contains no provision ensuring that a child is afforded the most optimal education possible. Rather, the statute aims to ensure children with disabilities are provided "meaningful" access to public education. *Rowley*, 458 U.S. at 192.

Review of the HOD in the context of the IDEA's substantive guarantees, structure, and remedial framework persuades the Court that, on the existing record, NMSD is likely to succeed in its argument that the remedy exceeds the DPHO's authority.

The IDEA requires an educational program reasonably calculated to enable a child to make appropriate progress in view of the child's circumstances — not the most optimal placement. Consistent with that standard, Congress did not "impose[] upon the States a burden of unspecified proportions and weight." *Rowley*, 458 U.S. at 190 n.11. Here, it appears the DPHO concluded that an out-of-state residential therapeutic program was G.G.'s most optimal placement. The

DPHO did not, however, find that such a placement was necessary to provide a FAPE, nor did the DPHO conclude that appropriate services could not be provided within New Mexico in a less restrictive environment.

An equitable remedy for the denial of a FAPE must take into account "all relevant factors." *Florence Cnty. Sch. Dist. Four*, 510 U.S. at 16. With respect to a prospective placement, those factors include "the nature and severity of the student's disability," the student's educational needs, the relationship between those needs and the services offered, the placement's cost, and the extent to which the placement constitutes the least restrictive environment. *Branham*, 427 F.3d at 12. While the DPHO examined the nature and severity of G.G.'s disability and his needs, the DPHO did not meaningfully tie those needs to the services offered by a therapeutic, residential school, nor did it examine the placement's cost and the extent to which it represents G.G.'s LRE. Instead, the HOD suggests that the DPHO arrived at this remedy based on findings that NMSD and SFPS had not provided a FAPE at certain points in time. While it is clear that the DPHO finds that G.G. benefits from behavioral support, the record does not demonstrate that resources at NMSD and SFPS could not be enhanced to provide those, or that no other facility in SFPS or elsewhere in the state is equipped to do so. Although reimbursement for private placement may be available where a public institution cannot provide a FAPE, that equitable remedy does not authorize a hearing officer to order out-of-state placement in the first instance. The record findings insufficiently support such a remedy here.

A limitation on the DPHO's authority to order prospective out-of-state placement without, first determining that the state cannot itself provide appropriate education, is supported by the IDEA's structure. The IDEA is a "federal spending statute" that provides funding to states and local agencies. *See Ellenberg v. N.M. Mil. Inst.*, 478 F.3d 1262, 1268 (10th Cir. 2007), *cert. denied*,

14

558 U.S. 1091 (2009).   States must, in turn, assure the federal government that they have procedures and programs in place to satisfy the IDEA's conditions, including assuring that all children within their territorial bounds receive a FAPE.  *See* 20 U.S.C. § 1412(a).  The statute, therefore, establishes a state-administered framework for the provision of special education services, under which state and local education agencies bear primary responsibility for ensuring that children receive a FAPE.  *See Ellenberg*, 478 F.3d at 1269 ("Responsibility for implementing the IDEA and policing IDEA compliance with the states . . . .").   Due process hearings are conducted within this system.

Further, the HOD assigns NMSD the task of locating an appropriate placement.  The IDEA, however, vests remedial authority in the reviewing court, *see* § 1415(e), and by extension, to the due process hearing officer.  By contrast, the statute does not grant remedial authority to the local educational agency.  Rather, the local educational agency's obligations are primarily prospective and programmatic — developing, reviewing, revising, and administering a student's IEP.  *See* 20 U.S.C. § 1413(d).  Requiring NMSD to identify and implement the very placement that serves as the remedy for its alleged statutory violations deviates from the division of authority established by Congress.  It effectively tasks the agency with crafting the remedy for its own noncompliance, a role the statutory scheme assigns elsewhere.  At minimum, the record does not clearly support imposing such responsibility on NMSD in the absence of more developed findings as to why in-state options are unavailable or inadequate.

Consistent with that structure, the IDEA contemplates that the provision of appropriate services will occur, in the first instance, through the State's own educational institutions, with private placement operating as a remedial mechanism where those institutions are unable to provide a FAPE.  § 1412(a)(10)(C); *see Burlington*, 471 U.S. at 369 (the IDEA's predecessor

"contemplates that [a FAPE] will be provided where possible in regular public schools . . . but the Act also provides for placement in private schools at public expense where this is not possible."). The DPHO's authority must be understood against that backdrop. The IDEA does not contemplate bypassing the state's educational institutions absent a determination that they are inadequate. Absent a determination that no in-state facility could provide a FAPE, the order likely exceeds the scope of the DPHO's authority under the IDEA.

In a similar vein, the IDEA's funding structure reflects that federal funds are allocated to states based on their particular needs and efforts to comply with the Act. Congress does not contemplate that one state's allocation will be diverted to another. Ordering a local educational agency to fund placement in an institution outside its jurisdiction redirects those funds in a manner inconsistent with that structure.

Finally, the IDEA places the child's parent at the center of placement decisions, requiring that such determinations be made through a collaborative process. *See Ellenberg*, 478 F.3d at 1269 ("The IDEA . . . [seeks] to maximize parental involvement in educational decisions . . . ."). To this end, the IDEA affords parents specified procedural rights, including, "participat[ing] in the IEP preparation process," "receiv[ing] notice before an amendment to an IEP is either proposed or refused, and "tak[ing] membership in any group that makes decisions about the educational placement of their child." *Id.* (citing 20 U.S.C. § 1415(b), (d), (f)). The HOD departs from that framework. G.G.'s mother did not seek an out-of-state residential placement and, in fact, opposes it. Selecting such a placement notwithstanding the parent's position is in tension with the statute's requirement of meaningful parental involvement in decisions affecting the child's education.

For these reasons, the Court concludes that NMSD has shown a substantial likelihood of success on the merits of its argument that the remedy exceeds the DPHO's authority.

### III.    The Balance of the Equities Tips in Favor of a Stay

The balance of the equities likewise favors a stay.  The party ostensibly protected by the HOD, G.G., and his mother, does not seek and indeed objects to, the ordered out-of-state placement.  **Doc. 11 at 3–4**.  In these circumstances, the Court cannot conclude that staying the order imposes cognizable harm on the student; rather, it preserves the student's current educational arrangement, which the parties have agreed to maintain.  By contrast, allowing the order to take effect would immediately obligate NMSD to expend substantial, potentially indefinite resources on a placement that neither the student nor parent has requested.  Moreover, it would be required to do so without a clear finding that G.G. would benefit from the ordered placement.  On balance, the equities therefore tip in favor of maintaining the status quo pending resolution of the merits.

### IV.    A Stay Is in the Public Interest

The final factor asks whether the public interest favors enjoining the relevant action.  This factor likewise weighs in favor of a stay.  The public has an interest in ensuring that students with disabilities receive a meaningful education.  Thus, if the HOD's remedy were in fact necessary to provide G.G. with a FAPE, there would be a public interest in its prompt implementation.  On the present record, however, there has been no showing that an out-of-state, residential, therapeutic placement is necessary to provide a FAPE, and that in-state options are inadequate.

Furthermore, the public interest weighs against immediate implementation of the HOD's remedy.  The record indicates that compliance would require NMSD to allocate a substantial portion of its annual budget to a single student, and, as the Court understands it, to draw those funds from a limited IDEA allocation.  *See* **HOD ¶ 25; Doc. 5 at 3**.  Such a diversion risks constraining the resources available to serve other students who benefit from NMSD's programs,

17

both on its Santa Fe campus and through its statewide outreach services.  On balance, the public interest is best served by maintaining the status quo pending resolution on the merits.

All four *Winter* factors, therefore, weigh in favor of enjoining the immediate implementation of the HOD.

## ADDITIONAL MATTERS BEFORE THE COURT

At the status conference on March 19, 2026, NMSD acknowledged it has an obligation and is willing to provide outreach services to G.G. on a current and ongoing basis.  NMSD's agreement and obligation to provide those services, as necessary and appropriate, is not affected by the stay.  To the extent the HOD requires the School to provide in-home services outside that scope, however, that aspect of the HOD's order is stayed.

Also on the oral record, NMSD represented that it has provided training to certain NMSD personnel as ordered by the HOD, *see* **HOD at 78–79**, and that it no longer seeks preliminary relief on that ground.  Therefore, the Court DENIES AS MOOT the portion of the Motion requesting a stay of the HOD's order regarding training.

## CONCLUSION

The Court, in common with all parties to this case, concludes that, on this preliminary record, the DPHO exceeded his authority under the IDEA.  The NMSD is likely to succeed on the merits of its argument that the IDEA does not permit an IDEA due process hearing officer to order a student's placement in an out-of-state private, residential school without parental consent.  The current record also supports that the IDEA does not provide authority to fashion such relief without explaining why a FAPE in the student's LRE cannot be provided in the student's state of residence.  The HOD's remedy is therefore STAYED pending a merits determination by the Court.  The Court GRANTS the School's Motion with respect to the DPHO's order to locate and fund a residential,

18

therapeutic out-of-state placement and DENIES AS MOOT the request to enjoin the DPHO's order to provide training to certain specified personnel.

Additionally, it is ORDERED that SFPS shall continue to provide appropriate educational services to G.G. pending further order of the Court.

It is finally ORDERED that NMSD shall continue to provide outreach services to G.G., as necessary and appropriate for his educational needs.

SO ORDERED.


/s/_____
WILLIAM P. JOHNSON
SENIOR UNITED STATES DISTRICT JUDGE